### UNITED STATES DISTRICT COURT
### EASTERN DISTRICT OF LOUISIANA

**GRACE SCOTT**                                                      **CIVIL ACTION**

**VERSUS**                                                               **NO. 20-2692**

**WESTBANK FISHING, LLC**                                 **SECTION: "G"(5)**


### ORDER AND REASONS

In this litigation, Plaintiff Grace Scott ("Plaintiff") bring claims individually and on behalf of her deceased husband, Robert Scott ("Scott"), against Defendant Westbank Fishing, LLC ("Defendant").[1] Plaintiff alleges that Scott was employed by Defendant as a chef aboard the vessel F/V KITTIWAKE, and died as a result of complications from COVID-19, which he contracted aboard the F/V KITTIWAKE.[2] Pending before the Court is Defendant's Motion for Summary Judgment.[3] Considering the motion, the memoranda in support and in opposition, the record, and the applicable law, the Court denies the motion.

### I. Background

Plaintiff alleges that her husband Robert Scott was employed by Defendant as a chef aboard the F/V KITTIWAKE, a vessel owned and operated by Defendant.[4] Plaintiff alleges that in July 2020, another crew member aboard the F/V KITTIWAKE began showing symptoms consistent

---

[1] Rec. Doc. 1.

[2] *Id.* at 4.

[3] Rec. Doc. 27.

[4] Rec. Doc. 1 at 3.

with COVID-19, and that the crew member remained working "without proper or adequate quarantine measures in place" for at least a day before the F/V KITTIWAKE returned to shore.[5] Plaintiff further alleges that two days later, a crew member from an unknown vessel ("Vessel X") joined the crew of the F/V KITTIWAKE to work alongside Scott.[6] However, Plaintiff alleges that Vessel X had recently returned to shore to seek medical care for a different crew member who was also demonstrating symptoms consistent with COVID-19.[7]

Plaintiff alleges that on July 12, 2020, Scott tested positive for COVID-19, and was hospitalized and placed on a ventilator days later.[8] Plaintiff alleges that Scott's kidneys began to fail and he underwent a surgery for the insertion of a dialysis catheter.[9] Nevertheless, Plaintiff avers that Scott's heart and lungs began to fail, and he later died while being transferred to University Medical Center in New Orleans for further treatment.[10] Plaintiff asserts claims for negligence under the Jones Act as well as unseaworthiness under general maritime law.[11]

---

[5] *Id.*

[6] *Id.* at 4.

[7] *Id.*

[8] *Id.*

[9] *Id.*

[10] *Id.*

[11] *Id.* at 5–6.

On May 17, 2022, Defendant filed the instant motion for summary judgment.[12] On June 21, 2022, Plaintiff opposed the motion.[13] On June 29, 2022, with leave of Court, Defendant filed a reply.[14]

## II. Parties' Arguments

### A.    Defendants' Arguments in Support of the Motion for Summary Judgment

Defendant argues that it is entitled to summary judgment because Plaintiff cannot prove that Scott contracted COVID-19 while aboard the F/V KITTIWAKE.[15] Defendant contends that although Plaintiff's expert "opines that [Scott] was most likely infected between July 5, 2020 and July 10, 2020, while on the F/V KITTIWAKE," the expert cannot "identify the source of [Scott]'s infection with any reasonable degree of certainty."[16] Rather, Defendant contends that Plaintiff's expert assumes, without evidence, that Scott contracted COVID-19 while on board.[17] Defendant contends that absent evidence of causation, an employer cannot be liable under the Jones Act for a seaman's injuries.[18] Therefore, Defendant argues it is entitled to summary judgment.

Alternatively, Defendant contends that it is entitled to summary judgment because there is no evidence that it acted negligently.[19] Defendant contends that it took "all precautionary measures

---

[12] Rec. Doc. 27.

[13] Rec. Doc. 44.

[14] Rec. Doc. 53-2; Rec. Doc. 62.

[15] Rec. Doc. 27-1 at 9.

[16] *Id.*

[17] *Id.*

[18] *Id.*

[19] *Id.* at 11.

3

and enforced new protocols to keep its vessels safe and clean," and that these measures were "obviously effective" because no other crewmember tested positive for COVID-19 prior to Scott.[20] Furthermore, because Plaintiff's expert "has not, and cannot, opine on whether [Scott] was exposed to the disease in aerosol or droplet form, nor whether Scott came into contact with a person or thing that contained the virus, "it is impossible for Plaintiff to show that [Scott]'s infection occurred because of some failing on behalf of Westbank."[21]

Similarly, Defendant contends that it is entitled to summary judgment on Plaintiff's unseaworthiness claim under general maritime law because Plaintiff cannot prove a causal connection between the Scott's injury and the breach of a duty that rendered the vessel unseaworthy.[22] Defendant contends that this standard is more demanding than the causation standard under the Jones Act.[23] Thus, Defendant argues that where a plaintiff cannot establish a claim under the Jones Act, a claim for unseaworthiness under general maritime law also fails.[24]

**B.      *Plaintiff's Arguments in Opposition to the Motion for Summary Judgment***

Plaintiff argues that Defendant was aware of the risk posed by the COVID-19 virus, promulgated safety measures in response, but nevertheless failed to enforce these safety measures.[25] Plaintiff contends that Defendant promulgated its "Coronavirus Vessel Operating Procedures" in April of 2020, which required daily temperature checks for all crew members and

---

[20] *Id.*

[21] *Id.*

[22] *Id.* at 13.

[23] *Id.*

[24] *Id.*

[25] Rec. Doc. 44 at 9.

4

prohibited non-crewmembers from accessing the vessel without approval from Defendant's management.[26] Plaintiff further argues that Defendant instructed its captains to make sure that everyone on the vessels wore masks, and had a rule "restricting its crewmembers of one boat from mingling with crewmembers from other boats in the fleet."[27] Nevertheless, Plaintiff argues that Defendant did not enforce these rules, and that temperature checks were not taken on a daily basis aboard the F/V KITTIWAKE and were rarely taken at all aboard other vessels in Defendant's fleet.[28] Plaintiff further highlights testimony of F/V KITTIWAKE crew member Joshua Faulkinbury who testified that crew members did not practice social distancing.[29] Plaintiff further points to evidence that crewmembers of different vessels would frequently intermingle on each other's vessels.[30] Plaintiff also provides evidence that crewmembers were not required to wear masks aboard the F/V KITTIWAKE.[31]

Plaintiff further argues that COVID-19 was "rampant" among Defendant's employees during the summer of 2020. Plaintiff points to evidence that, among the crewmembers tested, there were 29 positive COVID-19 tests between June 25, 2020 and July 19, 2020.[32] Relying on her expert, Plaintiff argues that "many people who are infected with COVID-19 are asymptomatic."[33]

---

[26] *Id.*

[27] *Id.*

[28] *Id.*

[29] *Id.* at 10.

[30] *Id.* at 10–12.

[31] *Id.* at 13–14.

[32] *Id.* at 14.

[33] *Id.* at 15.

Plaintiff points to F/V KITTWAKE crew member Reginald Hall, who worked on the F/V Kittiwake during the week of July 5–10, 2020 and tested positive for COVID-19 on July 15, 2020 despite not having any symptoms.[34]

Plaintiff argues that Scott and Plaintiff "were very wary of COVID-19," "took the pandemic quite seriously," and took "proper precautions to protect themselves."[35] Plaintiff points to evidence that Scott and Plaintiff spent the weekend prior to his COVID-19 infection together at their home in Abbeville, and that Scott did not have any symptoms of illness until the evening of July 12.[36] Plaintiff further argues that Scott showed no symptoms of illness to anyone on the F/V KITTIWAKE during the week of July 5 to July 10,[37] and that it was not until July 12 that anyone aboard the F/V KITTIWAKE noticed that Scott seemed sick.[38]

In response to Defendant's arguments that there is no evidence of causation, Plaintiff highlights her expert's testimony that "it is far more probable than not" that Scott was infected between July 5 and July 10 while aboard the F/V KITTIWAKE.[39] Plaintiff explains that by calculating "backward from the onset of [Scott]'s symptoms, one can conclude that for people presenting with their first COVID-19 symptoms at 6:00 pm on July 12, approximately 65% would have been infected between 6:00 pm on July 5 and 6:00 pm on July 10," which is the period of

---

[34] *Id*.

[35] *Id*. at 16.

[36] *Id*.

[37] *Id*.

[38] *Id*. at 16–17.

[39] *Id*. at 17.

time Scott was aboard the F/V KITTIWAKE.[40] Plaintiff argues that Dr. Jerome's conclusion is "strengthened dramatically by the fact that the conditions aboard boats and ships are known to pose an extremely high risk for COVID-19 transmission and the fact that Scott spent the weekends immediately before and after the July 5-10 hitch at home with his wife."[41] Plaintiff argues that Defendant's expert's testimony to the contrary "completely ignores the high-risk nature" of Scott's work aboard the F/V KITTIWAKE.[42] Nevertheless, Plaintiff argues that "competing expert testimony in and of itself depicts highly contested genuine issues of material fact," such that summary judgment should be denied.[43] Although Plaintiff acknowledges that Dr. Jerome explained that it is not possible to determine with absolute certainty when Scott was infected, the circumstances here make it "far more probable than not" that Scott was infected while aboard the F/V KITTIWAKE between July 5 and July 10.[44]

Lastly, Plaintiff argues that circumstantial evidence is sufficient to prove a Jones Act claim or a claim for unseaworthiness.[45] Plaintiff contends that the circumstantial evidence here is compelling and makes it far more probable than not that Scott was infected aboard the KITTIWAKE. Therefore, Plaintiff argues that summary judgment must be denied on both claims.[46]

---

[40] *Id.* at 18.

[41] *Id.* at 19.

[42] *Id*. at 20.

[43] *Id.*

[44] *Id.*

[45] *Id.* at 23–24.

[46] *Id.* at 24.

## C.      *Defendant's Arguments in Opposition to the Motion for Summary Judgment*

In reply, Defendant first argues that the deposition testimony that Plaintiff relies on to establish the conditions aboard the F/V KITTWAKE and Defendant's other vessels are from two former employees, and their testimony is "contested, ambiguous, and overly general."[47] Defendant argues that the deposition testimony from Mr. Faulkinbury is misleading because Mr. Faulkinbury "was not aboard the KITTIWAKE" between July 5 and July 10, and, his "overly broad and generalize swipes at Westbank do not show that Mr. Scott socialized in an impermissible way with anyone carrying the virus during the relevant time frame."[48] Defendant further argues that Mr. Sherrod, who also provided deposition testimony, "did not work with Mr. Scott or aboard the KITTIWAKE."[49] Furthermore, Defendant contends that there is no evidence that Scott was connected to any of the thirteen Westbank employees who tested positive for COVID-19 before Scott, and thus there are no facts "supporting any reasonable inference that [Scott]'s infection originated from one of them."[50] Defendant further contends that there is "no evidence that ties issues on one vessel with another," as "[e]ach vessel is separate and distinct."[51]

Defendant argues that Plaintiff's "entire case rests upon the opinion of Dr. Keith Jerome."[52] According to Defendant, Dr. Jerome's opinion is "grounded upon baseless assumptions" that (1) someone aboard the F/V KITTIWAKE between July 5 and July 10 carried COVID-19; (2) Scott

---

[47] Rec. Doc. 60 at 1.

[48] *Id.*

[49] *Id.*

[50] *Id.* at 2.

[51] *Id.*

[52] *Id.* at 3.

8

was not exposed to the virus outside of work; (3) Scott did not experience symptoms prior to July 12; and (4) the KITTIWAKE was "high risk" for COVID-19 transmission.[53] Defendant notes that Dr. Jerome admitted that he does not know of an individual who had COVID-19 aboard the F/V KITTIWAKE between July 5 and July 10, and argues that Dr. Jerome's opinion is an assumption "based on a temporal correlation" between the date of Scott's positive test and a study indicating an incubation period of 5.1 days.[54] Nevertheless, Defendant argues that Plaintiff and Dr. Jerome admit that the incubation period can vary and that it is not possible to determine with certainty when an individual was infected.[55] Defendant contends that Plaintiff does not explain why Scott "falls into that five-day window as opposed to any other generally accepted incubation timeframe, such as two or fourteen days from infection."[56] Defendant argues that the use of temporal correlation "leads to the blunder of the *post hoc ergo propter hoc* fallacy" and cannot "[c]arry Plaintiff's burden for proving causation."[57] In addition, Defendant contends there is evidence that Scott had symptoms prior to July 12, such that the "window of possible infection is moved back."[58] Furthermore, Defendant argues that Dr. Jerome's opinion that the F/V KITTIWAKE was "high risk" for COVID-19 is "absolutely baseless," and that "[i]f the virus at issue was not aboard the vessel, then it cannot be considered a high risk."[59]

---

[53] *Id.*

[54] *Id.*

[55] *Id.* at 3–4.

[56] *Id.*

[57] *Id*. at 4.

[58] *Id*.

[59] *Id.* at 5.

Lastly, Defendant notes that "[m]any states, including Louisiana, have enacted legislation protecting businesses, governmental entities, and individuals, from civil liability for COVID-19 infections absent gross negligence," which "reflect the strong public policy considerations that have been widely observed in the face of this unprecedented pandemic."[60] According to Defendant, these laws protect employers who may otherwise be held liable for their employees' illnesses "precisely because of the difficulty in isolating the exact time and mechanism of infection."[61] Defendant argues that "[t]hese public policy concerns should be considered by the Court for the same reason."[62]

### III. Legal Standard

Summary judgment is appropriate when the pleadings, discovery, and affidavits demonstrate "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[63] To decide whether a genuine dispute as to any material fact exists, the court considers "all of the evidence in the record but refrain[s] from making credibility determinations or weighing the evidence."[64] All reasonable inferences are drawn in favor of the nonmoving party.[65] Yet "unsupported allegations or affidavits setting forth 'ultimate or conclusory facts and conclusions of law' are insufficient to either support or defeat a motion for summary judgment."[66]

---

[60] *Id.*

[61] *Id.*

[62] *Id.*

[63] Fed. R. Civ. P. 56(a); *see also Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994).

[64] *Delta & Pine Land Co. v. Nationwide Agribusiness Ins. Co.*, 530 F.3d 395, 398–99 (5th Cir. 2008).

[65] *Turner v. Baylor Richardson Med. Ctr.*, 476 F.3d 337, 343 (5th Cir. 2007) (quoting *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000))

[66] *Galindo v. Precision Am. Corp.*, 754 F.2d 1212, 1216 (5th Cir. 1985); *Little*, 37 F.3d at 1075.

If the entire record "could not lead a rational trier of fact to find for the non-moving party," then no genuine issue of fact exists and, consequently, the moving party is entitled to judgment as a matter of law.[67] The nonmoving party may not rest upon the pleadings.[68] Instead, the nonmoving party must identify specific facts in the record and articulate the precise manner in which that evidence establishes a genuine issue for trial.[69]

The party seeking summary judgment always bears the initial responsibility of showing the basis for its motion and identifying record evidence that demonstrates the absence of a genuine issue of material fact.[70] "To satisfy this burden, the movant may either (1) submit evidentiary documents that negate the existence of some material element of the opponent's claim or defense, or (2) if the crucial issue is one on which the opponent will bear the ultimate burden of proof at trial, demonstrate that the evidence in the record insufficiently supports an essential element of the opponent's claim or defense."[71] If the moving party satisfies its initial burden, the burden shifts to the nonmoving party to "identify specific evidence in the record, and to articulate" precisely how that evidence supports the nonmoving party's claims.[72] The nonmoving party must set forth "specific facts showing the existence of a 'genuine' issue concerning every essential component of its case."[73]

---

[67] *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

[68] *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).

[69] *See id.*; *Ragas v. Tenn. Gas Pipeline Co.*, 136 F.3d 455, 458 (5th Cir. 1998).

[70] *Celotex*, 477 U.S. at 323.

[71] *Duplantis v. Shell Offshore, Inc.*, 948 F.2d 187, 190 (5th Cir. 1991) (quoting *Little*, 939 F.2d at 1299).

[72] *Forsyth v. Barr*, 19 F.3d 1527, 1537 (5th Cir. 1994), *cert. denied*, 513 U.S. 871 (1994); *see also Morris v. Covan World Wide Moving, Inc.*, 144 F.3d 377, 380 (5th Cir. 1998).

[73] *Morris*, 144 F.3d at 380; *see also Bellard v. Gautreaux*, 675 F.3d 454, 460 (5th Cir. 2012).

The nonmovant's burden of demonstrating a genuine issue of material fact is not satisfied merely by creating "some metaphysical doubt as to the material facts," "by conclusory allegations," by "unsubstantiated assertions," or "by only a scintilla of evidence."[74] Moreover, the nonmoving party may not rest upon mere allegations or denials in its pleadings.[75]

## IV. Analysis

Defendant moves for summary judgment on Plaintiff's claim under the Jones Act and for unseaworthiness under general maritime law. The Court will address each in turn.

### A.   *Jones Act Claim*

A Jones Act employer is required to exercise "ordinary prudence under the circumstances,"[76] to maintain a "reasonably safe work environment."[77] "In order to prevail in a claim for negligence, the plaintiff must present some evidence from which the fact finder can infer that an unsafe condition existed and that the vessel owner either knew, or in the exercise of due care should have known, of the condition."[78] While the Jones Act employer's duty to provide a reasonably safe place to work is broad in scope, it is not a form of strict liability.[79] "[T]he employer must have notice and the opportunity to correct an unsafe condition before liability attaches."[80]

---

[74] *Little*, 37 F.3d at 1075 (internal citations omitted).

[75] *Morris*, 144 F.3d at 380.

[76] *Gautreaux v. Scurlock Marine, Inc.*, 107 F.3d 331, 338 (5th Cir. 1997) (en banc).

[77] *Ober v. Penrod Drilling Co.*, 726 F.2d 1035, 1037 (5th Cir. 1984) (per curiam).

[78] *Martinez v. Offshore Specialty Fabricators, Inc.*, 481 Fed. App'x 942, 945 (5th Cir. 2012) (citing *Perry v. Morgan Guar. Tr. Co. of N.Y.*, 528 F.2d 1378, 1379 (5th Cir. 1976)).

[79] *Colburn v. Bunge Towing, Inc.*, 883 F.2d 372, 374 (5th Cir. 1989) (citing *Bobb v. Mod. Prods., Inc.*, 648 F.2d 1051, 1057 (5th Cir. 1981)).

[80] *Id.* (citing *Perry*, 528 F.2d at 1380).

Under the Jones Act, "an employer is liable for the negligence of his employees."[81] The Act "contains a liberal causation requirement."[82] "If the defendant's negligence played any part, however small, in producing the seaman's injury, it results in liability."[83] Furthermore, "entirely circumstantial evidence can prove a Jones Act claim."[84] This standard is "slight, well below the common-law standard."[85]

Defendant argues that there is no evidence that Defendant acted negligently, and no evidence that Scott contracted COVID-19 aboard the F/V KITTIWAKE. The Court disagrees. To begin, Plaintiff has provided ample evidence upon which a reasonable factfinder could conclude that Defendant knew or should have known about unsafe conditions aboard the F/V KITTIWAKE and other vessels. Plaintiff provides evidence that Defendant acknowledged the pandemic and took some precautionary measures to protect workers. Plaintiff points to deposition testimony of Defendant's corporate representative, Gustavo Chavarria, where he discusses that Defendant created a "Coronavirus Vessel Operating Procedure" in April of 2020,[86] the stated purpose of which was to "protect its workforce while ensuring continuity of operations during the ongoing outbreak of the Coronavirus respiratory disease."[87] These operating procedures required that each

---

[81] *Brister v. A.W.I., Inc.*, 946 F.2d 350, 354 (5th Cir. 1991).

[82] *Id.*

[83] *Id.* (citing *Chisholm v. Sabine Towing & Transp. Co., Inc.*, 679 F.2d 60, 62 (5th Cir. 1982)).

[84] *Jones v. United States*, 936 F. 3d 318, 322 (5th Cir. 2019) (quoting *Rogers v. Mo. Pac. R.R. Co.*, 352 U.S. 500, 508 (1957)) (quotation marks omitted).

[85] *Id.* at 323 (citing *Gautreaux v. Scurlock Marine, Inc.*, 107 F.3d 331 (5th Cir. 1997)) (alteration and quotation marks omitted).

[86] Rec. Doc. 44-10 at 24–25.

[87] *Id.* at 50.

crewmember be screened for fever or other signs and symptoms of COVID-19[88] and mandated that "NO non-crew members other than Westbank Fishing personnel shall be allowed access to the vessels at any time without the specific approval of WBF management."[89] In addition, Defendant's corporate representative testified that they practiced social distancing by not allowing crewmembers from one vessel to mingle with crewmembers of another vessel, and that everyone had to "stay in their vessel . . . [u]nless they're crossing from vessel to get to their vessel or crossing over to the dock. That is the only time they should be on another vessel."[90] Defendant's corporate representative further testified that its captains were responsible for making sure that everybody wore masks on the vessels.[91]

Nevertheless, Plaintiff points to evidence that these precautions were not enforced on Defendant's vessels. For example, Joshua Faulkinbury testified that Defendant "gave the captains masks to give to the crew, and you know, it was up to us whether or not we wanted to wear them."[92] Faulkinbury also testified that when docked, "people would just go to other ships. They would go to the galleys. They would go to people's rooms and hang out . . . people just - - they just did whatever they wanted."[93] When asked whether it was fair to say that "when y'all were docked, you were free to go about any of the other boats if you wanted to, as long as by the time you were

---

[88] *Id.*

[89] *Id.* at 51.

[90] *Id.* at 32.

[91] *Id.* at 31.

[92] Rec. Doc. 44-3 at 2.

[93] *Id.* at 5.

going to depart, you were back on your boat," Faulkinbury responded "right. That is correct."[94]
Faulkinbury also testified that crewmembers were not required to wear masks in the bunk area nor
in the galley.[95] Faulkinbury testified that crew members slept with two crew members in each
bunk, with "about four feet" in between each person.[96]

Furthermore, Plaintiff points to deposition testimony of Henry Sherrod, who testified that
he did not think that Defendant was taking appropriate measures to protect crewmembers from
COVID-19.[97] Sherrod testified that "there was no cleaning supplies; no masks. Coming in and out
of the gate, they wasn't properly checking the individuals."[98] Sherrod further testified that there
was no mask enforcement on the Sea Charger, another vessel owned by Defendant, that the bunk
and galley area was "snug," and that crewmembers were not directed to socially distance.[99]
Sherrod further testified that, to his knowledge, the F/V KITTIWAKE operated the same way.
Sherrod also testified that in July of 2020, the crew of the Sea Charger often interacted with the
crew of the F/V KITTIWAKE.[100] He stated that "[e]verybody mingled with everybody on . . .
different boats."[101] Sherrod testified that supervisors at Westbank knew that crewmembers were

---

[94] *Id*. at 5.

[95] Rec. Doc. 44-3 at 9.

[96] *Id.* at 9.

[97] Rec. Doc. 44-11 at 2.

[98] *Id.* at 3.

[99] *Id*. at 4.

[100] *Id*. at 5.

[101] *Id.*

15

visiting each other's boats, but did nothing to prevent them from doing so.[102] Lastly, Plaintiff offers evidence that crew members were often moved to work on different vessels.[103]

Additionally, Plaintiff has provided evidence to support her claim that Scott contracted COVID-19 aboard the F/V KITTIWAKE. In addition to the conditions described above, Faulkinbury testified that "there was people on other crews that had been tied up next to [the F/V KITTIWAKE] that had - - pretty much their whole crew had Covid, and then some of the dock workers also had Covid."[104] Additionally, Plaintiff provides evidence that between June 25, 2020 and July 19, 2020, twenty nine of Defendant's crew members and dock workers tested positive for COVID-19.[105] Plaintiff also highlights her expert's testimony that about 1/3 of individuals infected with COVID-19 do not develop noticeable symptoms.[106] Plaintiff's declaration suggests that Plaintiff and Scott took precautions to protect themselves from COVID-19 and that they spent the weekend prior to onset of Scott's symptoms alone at their home.[107]

Plaintiff also relies on her expert, Dr. Jerome, who opined that it is "far more probable than not" that Scott was infected with COVID between July 5 and July 10, 2020, during the time period he was aboard the F/V KITTIWAKE, because Scott did not develop symptoms until July 12, and the median incubation period for COVID-19 is 5.1 days.[108] Dr. Jerome explained that his

---

[102] *Id.*

[103] Rec. Doc. 44-10 at 40.

[104] Rec. Doc. 44-3 at 4–6.

[105] Rec. Doc. 44-10 at 49.

[106] Rec. Doc. 44-9 at 58.

[107] Rec. Doc. 44-4 at 1.

[108] Rec. Doc. 44-9 at 65–66.

conclusion was "strengthened dramatically" by his understanding of the conditions aboard the F/V

KITTIWAKE and the factors the CDC identifies as carrying a risk of COVID-19 transmission.[109]

In response, Defendant argues that there is "no evidence" that Scott contracted COVID-19

aboard the F/V KITTIWAKE. Defendant first contends that Faulkinbury's testimony is

"misleading" and "overly broad and generalized" because Faulkinbury was not aboard the F/V

KITTIWAKE between July 5 and July 10, 2020.[110] Defendant also suggests that Sherrod's

testimony is unreliable because he "did not work with [Scott] or aboard the KITTIWAKE."[111]

Although the evidence presented does support that Faulkinbury did not work for a two-week period

in July of 2020,[112] and that Sherrod worked aboard a different vessel owned by Defendant, both

witnesses' testimony is based on their knowledge of the conditions aboard the Defendant's vessels,

including the KITTIWAKE. Of course, Defendant may bring out these facts on cross examination

to undermine the witnesses' credibility. However, on a motion for summary judgment, the Court

"refrain[s] from making credibility determinations or weighing the evidence."[113] In fact, although

Defendant "vehemently disagrees with Plaintiff's assertions that [Defendant] failed to follow its

own rules and that the virus at issue was rampantly spreading among [Defendant]'s fisherman in

the early stages of the pandemic," Defendant makes no real attempt to dispute the evidence cited

by Plaintiff.[114] Rather, Defendant argues that because there is no evidence that Scott interacted

---

[109] Rec. Doc. 44-9 at 64.

[110] Rec. Doc. 60 at 2.

[111] *Id.*

[112] Rec. Doc. 60-1 at 4–5; Rec Doc. 60-5.

[113] *Delta*, 530 F.3d at 398–99.

[114] Rec. Doc. 60 at 1 ("Westbank vehemently disagrees with Plaintiff's assertions that Westbank failed to follow its own rules and that the virus at issue was rampantly spreading among Westbank's fisherman in the early

with any of the employees who tested positive, and that "there is no evidence that ties issues on one vessel with another," there is not sufficient evidence of causation to withstand summary judgment. The Court turns to that inquiry now.

As explained above, the Jones Act "contains a liberal causation requirement."[115] "If the defendant's negligence played any part, however small, in producing the seaman's injury, it results in liability."[116] Furthermore, "entirely circumstantial evidence can prove a Jones Act claim."[117] This standard is "slight, well below the common-law standard."[118]

Defendant argues that Plaintiff's evidence suggesting that crewmembers on other vessels were infected with COVID-19 is not "'probative' circumstantial evidence of causation that can withstand summary judgment," citing to the Fifth Circuit's decision in *Jones v. United States*.[119] In that case, the plaintiff sued his employer for negligence under the Jones Act and unseaworthiness under general maritime law after falling aboard the employer's vessel.[120] The plaintiff argued that there was grease in many places on the ship's deck, which likely caused his fall.[121] However, because the plaintiff did not see himself slip on grease, see grease on his shoes,

---

stages of the pandemic. Regardless, at this summary judgment stage, such assertions are a thinly veiled attempt to distract the Court from the glaring hole in Plaintiff's case—Plaintiff has no evidence that Mr. Scott was infected with the virus at issue while aboard the KITTIWAKE from July 5th through July 10th.").

[115] *Brister*, 946 F.2d at 354.

[116] *Id.* (citing *Chisholm v. Sabine Towing & Transp. Co., Inc.*, 679 F.2d 60, 62 (5th Cir. 1982)).

[117] *Jones v. United States*, 936 F.3d 318, 322 (5th Cir. 2019) (quoting *Rogers v. Mo. Pac. R.R. Co.*, 352 U.S. 500, 508 (1957)) (quotation marks omitted).

[118] *Id.* at 323 (citing *Gautreaux v. Scurlock Marine, Inc.*, 107 F.3d 331 (5th Cir. 1997)) (alteration and quotation marks omitted).

[119] Rec. Doc. 60 at 2–3 (citing *Jones*, 936 F.3d at 312).

[120] *Jones*, 936 F.3d at 320.

[121] *Id.* at 322.

nor did any other witness see grease in the area where the plaintiff fell, the Fifth Circuit held that the plaintiff did not have enough causation evidence to survive summary judgment.[122] The Fifth Circuit explained that "grease elsewhere on the ship's deck at various times [was] not 'probative' circumstantial evidence that can withstand summary judgment."[123] Because "some evidence must complete the path from worker injury to employer liability" and "[e]vidence that other parts of the ship were slippery at other times does not do so,"[124] the Fifth Circuit affirmed summary judgment for the employer.[125]

However, that case is distinguishable. Unlike in *Jones*, where the only evidence that the employer's conduct could have caused the injury was the existence of grease elsewhere on the vessel, there is evidence in the record here, described above, that Defendant did not enforce its COVID-19 safety protocols and that numerous employees of Defendant tested positive for COVID-19. Additionally, given Plaintiff's expert's opinion that the conditions aboard the F/V KITTIWAKE were particularly high risk for COVID-19 transmission based on CDC guidelines and that it is "far more likely than not" that Scott was infected with COVID-19 aboard the F/V KITTIWAKE, Plaintiff's evidence of causation is not as speculative as the plaintiff's mere guess in *Jones* that he slipped on grease. Additionally, because COVID-19 is a virus that cannot be seen, no witness could have "seen" the presence of COVID-19 in any place aboard the F/V KITTIWAKE occupied by Scott. Plaintiff must instead rely on the circumstantial evidence, which

---

[122] *Id.*

[123] *Id.*

[124] *Id.* at 322–23 (quotations and alterations omitted).

[125] *Id.* at 323.

Supreme Court and Fifth Circuit case law permit in Jones Act cases.[126] Therefore, the Fifth Circuit's decision in *Jones* does not foreclose Plaintiff's claims.

To be sure, Defendant has some evidence suggesting that Scott could have been infected with COVID-19 elsewhere. Defendant argues that Scott could have been exposed to COVID-19 "while stopping at a gas station, grocery shopping[, ] while at home[] from his wife, family members or friends, or during the course of any multitude of daily activities over which [Defendant] had no control."[127] Defendant highlights the deposition testimony of Robert Kell, who testified that another crew member reported to Kell that he was angry that Scott was aboard the F/V KITTIWAKE on July 12th because Scott had told that crew member that "he had this crap last week" and that "he was sick, but he was going to wait to see if it went away the weekend and see what it was like Sunday night."[128] Furthermore, F/V KITTIWAKE crew member Reginald Hall testified that Scott told him he "think[s] he caught the virus from his daughter" because "his daughter got something bad."[129] Although this may well be compelling evidence in Defendant's favor, it merely underscore's the Court's conclusion that there is a genuine dispute of fact that cannot be resolved on a motion for summary judgment.

Lastly, Defendant notes that "many states, including Louisiana, have enacted legislation protecting businesses, governmental entities and individuals, from civil liability for COVID-19

---

[126] *Jones*, 936 F. 3d at 322 (quoting *Rogers*, 352 U.S. at 508) (quotation marks omitted).

[127] Rec. Doc. 27-1 at 12.

[128] Rec. Doc. 60-6 at 4–5. Kell also noted that he did not remember which crew member reported this to him. *Id.* at 5.

[129] Rec. Doc. 60-3 at 5.

infections absent gross negligence."[130] Defendant contends that theses laws "reflect the strong public policy considerations" protecting employers from tort liability for their employee's illnesses "precisely because of the difficulty in isolating the exact time and mechanism of infection with this pervasive virus."[131] Defendant argues that "[t]hese public policy concerns should be considered by the Court."[132] The Court does not understand Defendant to suggest that the Louisiana statute limiting liability for COVID-19 infection applies to Defendant as a Jones Act employer. Nor does Defendant argue that Congress has made Jones Act employers immune from liability for their employee's COVID-19 infections. Rather, Defendant asks the Court to "consider" these inapplicable statutes in deciding the instant motion. However, these freewheeling policy arguments are not appropriate for the Court to consider. Therefore, for all of the reasons discussed above, Defendant is not entitled to summary judgment Plaintiff's Jones Act claim.

## B.   *Unseaworthiness Claim under General Maritime Law*

"General maritime law imposes a duty upon shipowners to provide a seaworthy vessel."[133] An unseaworthiness claim is "based on the vessel owner's duty to ensure that the vessel is reasonably fit to be at sea."[134] Unlike a Jones Act negligence claim, unseaworthiness does not require notice.[135] "A vessel is unseaworthy only if it presents an unreasonable risk of harm to the

---

[130] Rec. Doc. 60 at 5.

[131] *Id.*

[132] *Id.*

[133] *Luwisch v. Am. Marine Corp.*, 956 F.3d 320, 326 (5th Cir. 2020) (quoting *Hlodan v. Ohio Barge Line, Inc.*, 611 F.2d 71, 74 (5th Cir. 1980)).

[134] *Gowdy v. Marine Spill Response Corp.*, 925 F.3d 200, 205 (5th Cir. 2019) (quoting *Beech v. Hercules Drilling Co., L.L.C.*, 691 F.3d 566, 570 (5th Cir. 2012)).

[135] *Luwisch*, 956 F.3d at 328 n.1; *Mitchell v. Trawler Racer, Inc.*, 362 U.S. 539, 549 (1960) ("[T]he shipowner's actual or constructive knowledge of the unseaworthy condition is not essential to his liability.").

seaman."[136] The owner is not "obligated to furnish an accident-free ship."[137] Rather, seaworthiness requires only that "a vessel and its appurtenances must be reasonably suited for the purpose or use for which they were intended."[138] Furthermore, the duty to maintain a seaworthy vessel "is absolute and completely independent of [the] duty under the Jones Act to exercise reasonable care."[139] Thus, "how [an unseaworthy] condition came into being—whether by negligence or otherwise—is quite irrelevant to the owner's liability for personal injuries resulting from it."[140]

To succeed on an unseaworthiness claim, the plaintiff must also establish a causal connection between his injury and the breach of duty that rendered the vessel unseaworthy.[141] The standard of causation for an unseaworthiness claim is more demanding than for a Jones Act negligence claim and requires proof of proximate cause.[142] The plaintiff must prove "that the unseaworthy condition played a substantial part in bringing about or actually causing [an] injury and that the injury was either a direct result or a reasonably probable consequence of the unseaworthiness."[143]

Defendant argues that Plaintiff's unseaworthiness claim fails for the same reasons as her Jones Act claim. Specifically, Defendant argues that Plaintiff is unable to show that COVID-19

---

[136] *Park v. Stockstill Boat Rentals, Inc.*, 492 F.3d 600, 604 (5th Cir. 2007) (internal citations omitted).

[137] *Id.* (quoting *Mitchell*, 362 U.S. at 550).

[138] *Id.* (quoting *Johnson v. Offshore Express, Inc.*, 845 F.2d 1347 (5th Cir. 1988)).

[139] *Id.*

[140] *Usner v. Luckenbach Overseas Corp.*, 400 U.S. 494, 499 (1971).

[141] *Jackson v. OMI Corp.*, 245 F.3d 525, 527 (5th Cir. 2001) (citing *Caldwell v. Manhattan Tankers Corp.*, 618 F.2d 361, 363 (5th Cir. 1980)).

[142] *Gowdy*, 925 F.3d at 208–09.

[143] *Luwisch*, 956 F.3d at 326 (quoting *Offshore Express*, 845 F.2d at 1354).

was present on the F/V KITTIWAKE when Scott contracted COVID-19.[144] Defendant further highlights that because the causation standard for an unseaworthiness claim is higher than for a Jones Act claim, an unseaworthiness claim necessarily fails if the related Jones Act claim fails.[145] However, as described above, the Court has found that Defendant is not entitled to summary judgment on Plaintiff's Jones Act claim.

The Court agrees that the causation standard for an unseaworthiness claim is more demanding than for a Jones Act claim, as a plaintiff must prove that "that the unseaworthy condition played a substantial part in bringing about or actually causing [an] injury and that the injury was either a direct result or a reasonably probable consequence of the unseaworthiness."[146] However, just as with a Jones Act claim, circumstantial evidence is sufficient to support a claim for unseaworthiness.[147] Defendant's only argument as to the unseaworthiness claim is that it must fail because the Jones Act claim must fail as there is no evidence that COVID-19 was present on the F/V KITTIWAKE at the time Scott developed symptoms. However, the circumstantial evidence discussed at length above is sufficient to create a dispute of fact about whether Scott was infected with COVID-19 aboard the F/V KITTIWAKE. Therefore, Defendant's motion for summary judgment is denied.

---

[144] Rec. Doc. 27-1 at 13.

[145] *Id*.

[146] *Luwisch*, 956 F.3d at 326 (quoting *Offshore Express*, 845 F.2d at 1354).

[147] *Michalic v. Cleveland Tankers, Inc.*, 364 U.S. 325, 330 (1960) (explaining in an unseaworthiness case that "direct evidence of a fact is not required. Circumstantial evidence is not only sufficient, but may also be more certain, satisfying and persuasive than direct evidence."); *In re Cooper/T. Smith*, 292 F.2d 1073, 1077 (5th Cir. 1991) (explaining that summary judgment on the plaintiff's unseaworthiness claim was proper because there was "no evidence, circumstantial or otherwise," to support a finding of unseaworthiness).

**V. Conclusion**

Based on the foregoing,

**IT IS HEREBY ORDERED** that Defendant's Motion for Summary Judgment[148] is

**DENIED**.

      **NEW ORLEANS, LOUISIANA**, this 12th day of July, 2022.

                                      **NANNETTE JOLIVETTE BROWN**
                                        **CHIEF JUDGE**
                                        **UNITED STATES DISTRICT COURT**

---

[148] Rec. Doc. 27.

24